UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------x

TEAM NEW ZEALAND LIMITED.,                    :

      Plaintiff,                              :

– *against* –                                  :

SOCIÉTÉ NAUTIQUE DE GENÈVE,                   :
TEAM ALINGHI, S. A., AC MANAGEMENT,           :
S. A., and ERNESTO BERTARELLI                 :

      Defendants.                            :

------------------------------------------------x

**08 CV   2228**

**COMPLAINT AND
JURY DEMAND**

Case No.

## COMPLAINT

Plaintiff Team New Zealand Limited ("TNZ") by and through its undersigned counsel,

states for its Complaint, with knowledge of its own acts and upon information and belief as to all

other matters, as follows:

### Summary of the Action

1.     This action arises out of the anticompetitive conduct of Defendants Société

Nautique de Genève ("SNG"), Team Alinghi, S.A. ("Alinghi"), AC Management, S.A.

("ACM"), and Ernesto Bertarelli, and their co-conspirators, Real Federación Española de Vela

("RFEV") and Club Náutico Español de Vela ("CNEV").  Defendants compete with Plaintiff and

other sailing teams in the market for the right to hold the America's Cup, an international sailing

competition, which is a lucrative business opportunity, and in the market to sell sponsorship

rights for America's Cup sailing teams.  Defendants have sought to monopolize and have

monopolized the market for the right to hold the America's Cup, and have acted in concert with

CNEV and RFEV to restrain trade in the market to sell sponsorship rights for America's Cup

sailing teams in violation of Sections 1 and 2 of the Sherman Act.

2.      Under the Deed of Gift, the trust instrument that governs the America's Cup, any "organized yacht club" that meets certain criteria (including having an annual regatta on the sea or an arm of the sea) can challenge the defender of the Cup.  The defender is required to accept the first challenge and the defender and the challenger are to agree on terms for the next competition.

3.      Prior to successfully defending the America's Cup in July 2007, in an effort to solidify Alinghi's market power in the relevant markets, to monopolize the market for the right to hold the America's Cup and to unreasonably restrain competition in the market for the sale of sponsorship rights, instead of allowing an existing yacht club to issue a genuine challenge, Defendants conspired with RFEV, the Spanish national governing body for the sport of sailing, to form a sham "yacht club", CNEV, to issue a "challenge" to Alinghi (should Alinghi be the winner).  CNEV existed only on paper.  It had no real members and no yachts.  It had never held a single regatta, let alone and annual regatta on the sea or an arm of the sea.  It is not – in any sense of the word – an "organized" yacht club.

4.      In furtherance of Defendants' attempted monopolization and conspiracy to restrain trade, the day before Alinghi won the America's Cup, CNEV announced that it would issue its "challenge" if Alinghi won.  When Alinghi won the America's Cup on behalf of SNG (beating Plaintiff TNZ five races to two), CNEV issued its purported challenge and Defendants accepted.

5.      The purpose of the arrangement between Defendants and CNEV was to enable Alinghi to enhance its dominant position in the relevant markets, to weaken competitors, and to unreasonably restrain trade and reduce competition by ensuring that it would face a fabricated "challenger" that would enable Alinghi to avoid competition and to establish terms for the next

2

America's Cup that would advantage Alinghi and disadvantage its competitors. That is exactly what happened. Defendants "negotiated" a Protocol with CNEV that essentially gave ACM, a corporation owned and controlled by Ernesto Bertarelli (the owner of Alinghi), total discretion in setting the terms of the next America's Cup.

6.     Defendants' conduct has directly and substantially harmed competition and consumers. Specifically, it enabled Defendants to establish a Protocol for the next America's Cup that unreasonably restrains trade and reduces competition by heavily favoring Defendants and unfairly disadvantaging their competition. This unfairly enhances Defendants' prospects of winning the next Cup, which means, among other things, that Defendants' rivals will have a dramatically decreased incentive to compete in the America's Cup, and therefore in the market to sell sponsorship rights, with the result that there will be fewer sellers of sponsorship rights. Defendants' actions also enable them to postpone the America's Cup indefinitely. This will likely cause less well-funded teams to exit the market, because teams rely on sponsorship, which is difficult to obtain for an event to be held at some indefinite time in the future, and because it is expensive to maintain a team over an extended period of time. This will further limit the number of sellers of sponsorship rights. Defendants' actions have also harmed the quality of the event, since viewers will not want to watch an event that is not a competition among the best sailing teams, particularly where one team has skewed the rules in its favor. This directly negatively impacts the quality of the sponsorship rights.

7.     In addition, Defendants sought to eliminate Plaintiff as a competitor by inducing Plaintiff to enter the next America's Cup race (by promising to hold the Cup in Valencia in 2009) and then, after Plaintiff entered the competition and expended considerable sums in

3

reliance on Alinghi's promise and undertaking, reneging on its promise, causing Plaintiff serious damage, raising its costs and threatening to eliminate it as a competitor.

8.      Finally, Defendants refused to reach a reasonable settlement with the Golden Gate Yacht Club ("GGYC") that would have enabled the America's Cup to proceed in Valencia in 2009. Again, this delay has the effect of eliminating competitors in the market who cannot afford to continue to pay sailing and design teams and other staff without receiving sponsorship money.

9.      All of these actions were intended to and did have the effect of stifling competition in the market for sponsorship of America's Cup teams. In addition, Defendants' actions were undertaken with the intent to monopolize the market for the right to hold the America's Cup.

**The Parties**

10.     Plaintiff Team New Zealand ("TNZ"), a world class racing team, is a corporation organized under the laws of New Zealand with its principal place of business in Auckland, New Zealand. TNZ represents the Royal New Zealand Yacht Squadron ("RNZYS"), the Challenger in the final match for the 32nd America's Cup and previous defender of the Cup. TNZ organizes sailing teams to compete in the America's Cup. It sells the rights to sponsor the team to entities located throughout the world, including the United States.

11.     Defendant SNG is a yacht club organized under the laws of Switzerland and based in Geneva, Switzerland. It is the current holder of the America's Cup, which it won in 2003 and 2007 through its affiliate, Alinghi. As the current holder of the America's Cup, SNG is the trustee of the trust, formed under the laws of the State of New York, which holds the America's Cup trophy for the benefit of all competitors.

4

12.     Defendant Alinghi is a sailing team affiliated with, and representative of, SNG and is the winner of the 2003 and 2007 America's Cup. It sells the rights to sponsor the team to entities located throughout the world, including the United States.

13.     Defendant AC Management, S.A. ("ACM") is a Swiss limited liability company with headquarters in Geneva, Switzerland, appointed by SNG to organize, manage, and fulfill all of SNG's obligations under the Deed of Gift.

14.     Defendant Ernesto Bertarelli, a Swiss citizen, is the founder and owner of both Alinghi and ACM.

### The Co-Conspirators

15.     Real Federación Española de Vela (Royal Spanish Sailing Federation) ("RFEV") is the national governing body for the sport of sailing in Spain. RFEV is a private organization with its principal place of business in Madrid, Spain. While its members include yacht clubs, it is not itself a yacht club. RFEV conspired with Defendants and others to restrain trade in the relevant markets, as alleged herein.

16.     CNEV is a paper yacht club incorporated in Valencia, Spain established by RFEV as part of the conspiracy alleged herein to restrain trade in the relevant markets. CNEV conspired with Defendants and others to restrain trade in the relevant markets, as alleged herein.

### Jurisdiction and Venue

17.     Plaintiff brings this action under Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 15, 26) and Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a).

18.    The Defendants transact business within this District.  Accordingly, this Court has personal jurisdiction over each Defendant, and venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b).

### Trade and Commerce

19.    The America's Cup is broadcast in the United States to millions of viewers.  In addition, teams that compete in the America's Cup sell substantial amounts of sponsorship rights to entities located in the United States and doing business in the United States.  Defendants' anticompetitive conduct has had a substantial effect on interstate commerce.

### Factual Background

**A.    The Relevant Markets**

20.    The Defendants' antitrust violations have occurred in the market to sell the rights to sponsor defenders and challengers in the America's Cup competition, and in the market for the right to hold the America's Cup.

21.    The America's Cup is the most prestigious sailing competition in the world and the longest-running sports competition in the world.  The America's Cup trophy itself is the corpus of a trust established under the laws of New York by a Deed of Gift dated October 24, 1887 that gave the trophy to the New York Yacht Club to be held in trust as a "challenge" trophy to promote friendly sailing competition among nations (the "Deed of Gift").  The Deed of Gift establishes the rules that govern the competition for the Cup.

22.    Under the Deed of Gift, any yacht club that meets the requirements for a challenger set forth therein has the right to challenge the yacht club that holds the Cup.  Among other things, to be a legitimate challenger under the Deed of Gift, the challenger must be an organized yacht club that holds an annual regatta.

23.    The America's Cup is the third most watched sporting event in the world.  In 2007, over 2.7 billion people watched the 32nd America's Cup either live or on television.  Over 2.8 million people visited the America's Cup port to see the participants and the races.  The official internet site of the America's Cup received 16.6 million visits during 2007.  These audiences are an attractive market to advertisers, and they enable teams that compete in the America's Cup to sell sponsorship rights to cover the costs of fielding a racing team, which can be up to $200 million, and to try to make a profit.

24.    The viewership of the America's Cup is international in scope, comprises people interested in sailing, and includes many affluent consumers.  Sponsors cannot easily substitute sponsorship of the America's Cup for another sporting event.

25.    Teams compete directly for sponsorship, since the audience for all teams is obviously the same.  Teams compete on a number of grounds, but the most significant is the ability to win.  Sponsors are simply more interested in sponsoring a winner than sponsoring a loser.  This is reflected in the advertising slogan used by ACM in the 32nd America's Cup: "There is no Second."

26.    The defender of the America's Cup has an additional means of generating revenue.  Specifically, the defender has the right to select the location of the next competition.  Hosting the America's Cup is, like the Olympics, extremely valuable to the host city.  It is estimated that the global economic impact of hosting the 32nd America's Cup is more than $9 billion for the host country, Spain.  The city of Valencia, Spain received investment exceeding $1.8 billion.  The event also created more than 60,000 jobs.  Accordingly, as with the Olympics, cities compete for the right to host the Cup.  Among other things, potential host cities offer concessions to the defending team.  These can be extremely valuable to a team.  It is estimated

that the City of Valencia and the Spanish government provided ACM with concessions valued at $135 million in connection with the 32nd America's Cup.

**B.    Market Power**

27.    Under the Deed of Gift, the defender has a certain degree of control over the rules for the next America's Cup.  The Deed of Gift provides that "The Club challenging for the Cup and the Club holding the same may, by mutual consent, make any arrangement satisfactory to both as to the dates, courses, number of trials, rules and sailing regulations, and any and all other conditions of the match."  Accordingly, the defender of the Cup enjoys substantial market power in the relevant markets.

28.    Alinghi has abused and extended this market power, by, among other things, conspiring with RFEV to facilitate the creation of CNEV and then issuing a Protocol for the next America's Cup that gives almost unlimited power to its agent ACM and substantially limits competition.  In return for its involvement in the conspiracy, RFEV cemented Valencia as the host city and Spain as the host country for the 33rd America's Cup.

29.    As evidence of Defendants' market power, several teams, including Plaintiff (although on the basis of concessions obtained by contract from Defendants as to the timing and venue of the Event, among other things), agreed to sign onto Defendants' one-sided protocol for the 33rd America's Cup and sponsors have purchased sponsorship rights, despite the decreased quality of the event, because there are no substitutes.

**C.    The Defendants' Concerted Anticompetitive Conduct**

30.    Before Alinghi had even won the 32nd America's Cup, Defendants began to conspire to fix the terms of the next America's Cup so that Defendants could eliminate their

competitors in the market for the right to hold the America's Cup (a right granted to the defender), severely weaken the competitive ability of such competitors and thereby unreasonably restrain trade and limit competition in the market to sell team sponsorship.

31.    The most significant hurdle to Defendants' dominance in the market was the fact that, under the Deed of Gift, the defender is required to either negotiate terms for the next competition with the first valid challenger or race the event pursuant to the Deed's default rules. The purpose of this requirement is to ensure that rules are set that facilitate vigorous competition. In order to sidestep that rule, Defendants had to find a "challenger" that would not negotiate vigorously and would enable Defendants to establish a Protocol for the next race that would give SNG and its affiliate Alinghi an unfair advantage so that it could reduce competition in the relevant markets.

32.    The Deed of Gift also limits the market power of the defending club by requiring that it accept the first challenge posed by a yacht club fulfilling the Deed's requirements: "And when a challenge from a Club fulfilling all the conditions required by this instrument has been received, no other challenge can be considered until the pending event has been decided."

33.    To circumvent the limitations imposed by the Deed of Gift on Defendant's market power, Defendants agreed with RFEV, which is the Spanish national sailing federation, not a yacht club at all, that RFEV would issue a "challenge" to Alinghi if Alinghi won the America's Cup. However, it became clear to Defendants and the co-conspirators that RFEV could not be a valid challenger because it was a national federation, not a yacht club. Acting on the advice of its lawyers and the request of Defendants, RFEV quickly formed CNEV.

34.    CNEV has no yachts. It has no members other than the directors of RFEV who executed its incorporation and registration papers days before CNEV issued its challenge.

CNEV had no telephone number and no website. As of the date of CNEV's challenge, CNEV had never held an annual regatta, which is one of the few qualifications required by the Deed of Gift. CNEV attempted to hold two "regattas," one of which involved children sailing during a training session and the other of which CNEV co-sponsored with another yacht club. Neither of these "regattas" satisfies the Deed of Gift's requirement because, among other reasons, they both post-date CNEV's purported challenge.

35.     On July 2, 2007, the day before the final 32nd America's Cup race, pursuant to its agreement with Defendants, CNEV announced that, if SNG successfully defended the Cup, CNEV would challenge SNG for the 33rd America's Cup. On July 3, 2007, Alinghi, representing SNG, defended the America's Cup by defeating TNZ. CNEV immediately issued its purported challenge, which SNG accepted.

36.     SNG then "negotiated" a protocol for the next America's Cup with the paper yacht club CNEV. On July 5, 2007 SNG and CNEV distributed the "Protocol Governing the Thirty Third America's Cup" (the "Protocol").

37.     The Protocol provides that SNG may appoint ACM, a commercial organization owned and controlled by Ernesto Bertarelli (who also owns Alinghi), as the Event Authority. The Protocol awards ACM "the ultimate responsibility for the management, organization, and financing of the Event." Thus, Defendants secured for themselves the right to set the terms of the Cup so that they could reduce competition by unfairly disadvantaging their competitors.

38.     For example, ACM has the power, in its sole discretion, to appoint the members of the Race Committee, the Measurement Committee, Umpires, and "such other persons as are reasonably necessary in discharging the duties outlined" in the Protocol. ACM has the power to fine competitors for "non-compliance" of rules, to deduct fines from any moneys due to

competitors, and to take legal action necessary to recover outstanding fines. ACM may "impose any rule and restriction on the Competitors that are necessary to the fulfillment of its duties under the Deed of Gift and this Protocol." ACM even has the power to cherry-pick who those competitors will be, inasmuch as ACM "may accept or reject any entry received" based on four enumerated yet expansive grounds, including failure to abide by the Deed of Gift or the terms of the Protocol.

39.    Unlike the 32nd America's Cup Protocol, which was negotiated between SNG and the Golden Gate Yacht Club ("GGYC"), the 33rd America's Cup Protocol eliminates the rights of challenging competitors. The 32nd Protocol established the Challenger Commission, which consisted of a representative from each challenging team and enjoyed certain voting rights. The 33rd Protocol replaces the Challenger Commission with a "Competitors' Commission," which has no voting powers. The 32nd Protocol provided that the Challenger of Record represented the interests of all challengers, whereas the 33rd Protocol here absolves CNEV of such duty, stating that "the Challenger of Record shall not owe any additional duties to the Challenging Competitors."

40.    Unlike the 32nd America's Cup Protocol, which adopted pre-existing America's Cup Class ("ACC") Rules, the Protocol allows ACM to issue new ACC Rules that will determine the class of yacht allowed to participate in the match. ACM may also amend those rules, provided that CNEV and Alinghi give their token approval. The Protocol requires only that ACM provide challengers 18 months to prepare, design, finance, and build a vessel for the match. Alinghi, as an affiliate of ACM, will have access to rules before they are issued and will thus have longer than its competitors to prepare.

11

41.    ACM may also determine the event's racing schedule 16 months before the first race and may withhold the Notice of Race and Sailing Instructions until "approximately 60 days before the first race of the Event." ACM may withhold the Racing Rules until "approximately 60 days before a race of the Event in which they are applicable." Again, this allows Alinghi to have access to information before its competitors.

42.    Furthermore, the Trials and Challenger Section format announced by ACM "may provide for the Defender an option to participate wholly or partly at its discretion in the Trials and Challenger Selection other than the final between the two Challengers to select a Challenger for the Match." Thus, SNG has reserved its right to compete against a variety of challengers without facing elimination.

43.    SNG has delegated the following additional duties to ACM in its sole discretion: to determine time limits for registering; to issue Competition Regulations, including limitations for training and testing; to take and distribute the minutes of the Competitors' Commission to all competitors represented; to determine whether there will be qualifying regattas and how they shall be scored; to decide whether competitors may build one, two, or more new boats; to determine and change venue; to determine the race and course areas and limit their use outside the racing periods; and to amend unilaterally the restrictions regarding crew members and designers.

44.    The Protocol also established an Arbitration Panel to resolve disputes relating to the Protocol. However, the Panel has proven itself not to be independent. Specifically, on July 20, 2007, GGYC filed a complaint against SNG in the Supreme Court of New York. GGYC alleged that SNG breached its fiduciary duty to GGYC and the Deed of Gift by accepting CNEV's purported challenge and by issuing the invalid protocol. GGYC, who served a Notice

12

of Challenge upon SNG on July 11, 2007, also sought a declaratory judgment that GGYC, not CNEV, was the Challenger of Record. In an effort to preempt the New York Supreme Court's consideration of this issue, SNG and CNEV submitted unopposed papers requesting that the Arbitration Panel deem CNEV's challenge valid and that the Protocol complies with the Deed of Gift. The Arbitration Panel "arbitrated" the issue even though GGYC refused to participate. The "opposition" cited by the Arbitration Panel consisted of a letter by GGYC's lawyers stating that GGYC *would not* participate in the "arbitration" and a review of "the contents of all the material placed on GGYC's website up to the date of this Decision, including the documents filed with the Supreme Court for the State of New York." Unsurprisingly, the Arbitration Panel issued a lengthy decision in favor of SNG and upheld the validity of the CNEV challenge, on grounds that are wholly unsupportable, as demonstrated by the decision of the New York Supreme Court.

45.     In addition to conspiring to create rules for the next America's Cup that disadvantage its competitors, Defendants have threatened to put Plaintiff and other potential competitors out of business, thereby unreasonably restraining trade in the relevant markets and monopolizing the market for the right to hold the America's Cup by unilaterally postponing the next Cup. The Cup was originally scheduled to take place in Valencia, Spain in 2009. In reliance upon Defendants' undertaking and promise that the Cup would be held in Valencia, Spain in 2009, Plaintiff settled its budget for a 2009 event. It negotiated amounts to be provided by its major sponsors based on that budget. It also entered into employment contracts with a number of parties, all of whose employment would be necessary to ensure its successful challenge for the Cup. Those key personnel included yachtsmen, designers, and senior management. TNZ has devoted significant resources in preparation for a 2009 race in Valencia.

46.     TNZ is in the business of challenging and defending the America's Cup.  In the sailing world, there is no substitute for the America's Cup.  While TNZ was not willing to enter the 33rd America's Cup on the terms announced by SNG and CNEV in the Protocol, which granted ACM full discretion as to the event's timing, TNZ was willing to sign onto the Protocol on the condition, among others, that the next America's Cup would be held in Valencia in 2009.

47.     Defendants subsequently unilaterally declared that the event would be delayed until at least 2011.  Defendants also refused to agree to a proposal to settle the GGYC lawsuit that would have enabled the Cup to proceed in 2009.  Defendants know that Plaintiff and other potential competitors cannot continue to pay the costs of running a team for an indefinite amount of time without sponsorship, and that sponsors will not pay for an event if they do not know when or where it will take place.  These actions were undertaken with the intent to, and had the effect of, reducing competition in the relevant markets by dramatically increasing the costs of Plaintiff and other competitors in competing against Defendants for the America's Cup.

**D.     Anticompetitive Effects of Defendants' Unlawful Conduct**

48.     Defendants' actions have had a direct and substantial negative effect on competition in the relevant markets.  The Protocol established pursuant to Defendants' conspiracy with CNEV unfairly enhances Defendants' prospects of winning the next Cup such that Defendants' rivals have a dramatically decreased incentive to compete in the America's Cup and therefore to sell sponsorship rights.  This means that there will be fewer sellers of sponsorship rights.

49.     In addition, Defendants' indefinite postponement of the Cup will likely cause teams that are not as well funded as Alinghi to exit the market.  The delay has already

14

substantially raised Plaintiff's costs and Plaintiff will likely be forced to exit the market if the event is delayed until 2011.  This will further limit the number of sellers of sponsorship rights.

50.     Defendants' actions have also affected the quality of the event.  Sailing fans do not want to watch an event that is not a competition among the best sailing teams, particularly where one team has skewed the rules in its favor.

51.     These effects have been felt strongly in the United States.  United States sponsors and sponsors who are licensed to conduct business in the United States, including Emirates, Toyota, and BMW, have been negatively affected by Defendants' acts.  In addition, viewers in the United States have been harmed by the delay and the degradation of quality.

**E.     Injury to TNZ**

52.     Defendants' anticompetitive conduct has directly and proximately caused Plaintiff to suffer injury to its business and property.  Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and those injuries flow directly from the aspects of Defendants' conduct that make it unlawful.

53.     Specifically, Plaintiff has suffered, among other things:

(a)  Increased costs as a result of Defendants' delay of the event.

(b)  Lost revenues from sponsorship due to the decrease in the perceived quality of the America's Cup, and due to Plaintiff's decreased chances of winning.

## CLAIMS FOR RELIEF

### Count I
### Sherman Act § 1: Conspiracy to Restrain Trade

54.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 53 as if fully set forth herein.

55.    Defendants have engaged in a combination and conspiracy to unreasonably restrain trade in the relevant markets.

56.    In furtherance of this conspiracy, Defendants have promulgated the Protocol and taken other actions that disadvantage or exclude rivals in the market to sell sponsorship of America's Cup teams.

57.    This conspiracy has caused significant harm to competition in the relevant markets.

58.    As a result of the conspiracy and its harm to competition, Plaintiff has suffered substantial and continuing injuries.

### Count II
### Sherman Act § 2: Conspiracy to Monopolize

59.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

60.    Defendants have engaged in a combination and conspiracy to monopolize the market for the right to hold the America's Cup sailing competition.

61.    In furtherance of this conspiracy, Defendants have promulgated the Protocol and taken other actions that disadvantage or exclude rivals in the market to hold the America's Cup.

62.    This conspiracy has caused significant harm to competition in the relevant markets.

63.    As a result of the conspiracy and its harm to competition, Plaintiff has suffered substantial and continuing injuries.

### Count III
### Sherman Act § 2: Attempted Monopolization

64.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 63 as if fully set forth herein.

65.    Defendants possess market power in the market for the right to hold the America's Cup.

66.    There is a dangerous probability that Defendants will achieve monopoly power in the market for the right to hold the America's Cup.

67.    Defendants have a specific intent to monopolize the market for the right to hold the America's Cup.

68.    In furtherance of this attempted monopolization, Defendants have promulgated the Protocol and taken other actions that disadvantage or exclude rivals in the market to hold the America's Cup.

69.    These actions have caused significant harm to competition in the relevant markets.

70.    As a result of this attempted monopolization and its harm to competition, Plaintiff has suffered substantial and continuing injuries.

**Count IV**
**Sherman Act § 2: Monopolization**

71.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

72.    Defendants possess monopoly power in the market for the right to hold the America's Cup.

73.    Defendants have willfully obtained and/or maintained that monopoly power.

74.     Intending to exercise that monopoly power, Defendants have promulgated the Protocol and taken other actions that disadvantage or exclude rivals in the market to hold the America's Cup.

75.     These actions have caused significant harm to competition in the relevant markets.

76.     As a result of this monopolization and its harm to competition, Plaintiff has suffered substantial and continuing injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

a.     Declare, adjudge and decree that Defendants have committed the violations of federal law alleged herein;

b.     Order that the Defendants, their directors, officers, employees, agents, successors, owners and members be enjoined and retrained from continuing the anticompetitive acts alleged herein;

c.     Award Plaintiff full compensation for the damages it has sustained, from each Defendant, jointly and severally, on each of Plaintiff's claims for relief, in an amount to be determined at trial, and to be trebled according to law, plus interest, attorneys' fees and costs of suit, and such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2008

Respectfully submitted,

BOIES, SCHILLER & FLEXNER, LLP

David Boies (DB-4399)
333 Main Street
Armonk, New York 10504
(914) 749-8200

Philip M. Bowman (PB-9222)
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300